**Dated: February 7, 2020**

**The following is ORDERED:**



Tom R. Cornish
TOM R. CORNISH
UNITED STATES BANKRUPTCY JUDGE

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

IN RE:
**JEREMY DANIEL TAYLOR**  Case No. 17-80692-TRC
dba Taylor Family Construction  Chapter 7
dba Panther A/C and Property Maintenance
dba Taylor Family Construction LLC
dba Express Repair Services LLC
dba Express Pilot Car LLC
dba Thunder Pilot Car LLC

                    Debtor.

**JOE PHILLIP POWELL**
**LINDA POWELL**
                    Plaintiffs,

vs.  Adv. No. 17-8019-TRC

**JEREMY DANIEL TAYLOR**
                    Defendant.

## **OPINION**

      This dispute arose over the remodeling and renovation of a 112-year-old house just

outside the city limits of Hearne, Texas. The Plaintiffs, Joe and Linda Powell, hired Defendant

Jeremy Taylor to do the construction work. The home was not completed satisfactorily in accordance with the Powells' expectations. They sued Taylor for the total cost of the renovations in Texas state court. When Taylor filed bankruptcy in Oklahoma, they filed this adversary case seeking to except their claim against him from discharge. Having carefully reviewed the record, exhibits and testimony of the parties, the court has concluded that Plaintiffs have not met their burden of proof; therefore, the court finds in favor of Defendant Taylor.

## I. Jurisdiction

This court has jurisdiction over this case pursuant to 28 U.S.C. § 1334(b), and may hear and determine this case pursuant to 28 U.S.C. § 157(b)(2)(I). Venue is proper pursuant to 28 U.S.C. § 1408.

## II. Findings of Fact

Mr. and Mrs. Powell are retired. In 2016, the Powells purchased a home outside the city limits of Hearne, Texas with the intent that they would renovate the home. The home was described as an old barn that had been moved to its present location approximately 30 to 40 years prior to the Powells' purchase. The Powells described the condition of the home as fair. The home had been inhabited by the previous owners but the Powells desired to make needed repairs and renovate it using new and used materials. The Powells purchased the interior of another house, which had been uninhabited for over 15 years, and wanted to incorporate those materials into the home they were remodeling, including shiplap, floors and trim.

In attempting to find a contractor to hire to perform renovations, Mr. Powell discovered that many local contractors were busy with other jobs, due to a recent tornado that caused significant damage to homes and businesses in that area. Mr. Powell was introduced to Roy Henry, Taylor's father-in-law, by a friend. Henry recommended Taylor to the Powells, stating

that they had worked together on many construction projects, and representing that Taylor had extensive experience in the McAlester, Oklahoma area. Mr. Powell met Taylor and believed him to be trustworthy and have sufficient experience and skills to perform the work required. The Powells viewed photos on Taylor's phone of projects he had completed. They did not conduct any independent research into Taylor or his father-in-law, nor did they seek or obtain recommendations or opinions from Taylor's previous customers. The Powells did not request any information, financial or otherwise, from Taylor before they hired him to renovate their home.

At the time the parties met, Taylor and his wife lived in Texas, although they were separated for a time. Taylor had worked in Oklahoma and Texas, and had an Oklahoma LLC that was not in good standing at the time he met the Powells. Taylor's construction experience consisted of remodeling projects primarily in McAlester, Oklahoma but he had also worked on several projects in the Hearne, Texas area. Prior to working for the Powells, Taylor had completed a project in town nearby. Taylor was also a licensed HVAC technician. Taylor informed the Powells that he had not formally registered as an LLC in Texas, although his Proposal was from "Taylor Family Construction L.L.C." with a Hearne, Texas address.

Taylor and the Powells walked through the home to determine the scope of the project. The Powells were to act as the general contractor on the project, purchasing materials themselves and hiring separate subcontractors for electrical and other construction work. After the walk-through and consultation with the Powells, Taylor estimated that the project would cost between $80,000 and $85,000 for labor and would require approximately 8 weeks to complete. Taylor hand-wrote the terms, a description of the work to be performed, and exclusions on a Taylor Family Construction LLC Proposal form. Materials were to cost under $30,000 and be of mid-

grade quality, with Taylor removing the materials from the other house and transporting to the Hearne house for a separate price. A preprinted sentence on the Proposal stated that Taylor proposed "to furnish the materials and perform the labor necessary." However, the parties stipulated in the Pretrial Order and testified at trial that their agreement was for Taylor to perform the labor for the price of $80,000 to $85,000, and the Powells would purchase the materials separately. The Powells were to pay 20% or $16,000 upon acceptance of the Proposal, then $6,000 each Friday. The work to be completed by Taylor was listed as plumbing, walls, doors, roof, interior spaces, master bath, laundry room, and a porch addition. The Proposal also provided that "unforseen problems or issues will be handled on case by case basis." Exclusions were identified as electrical work, house leveling, light fixtures, and hot water heater. Electrical work had already been performed prior to Taylor beginning work on the house. The Proposal was dated August 21, 2016 and was signed by Taylor and Mr. Powell.

The Powells only paid $4,000 prior to the start of the project, but eventually paid the entire $16,000 down payment. The Powell's did not provide bank account statements, but they did provide copies of checks totaling $68,000 in payments directly to Taylor. The Powells claim to have paid him more than that but stated that their bank only had record of $68,000. The checks were made payable to "Jeremy Taylor" and all but two were issued on the separate bank account Mr. Powell opened to pay for the remodeling work. One check was for $1,000 with the memo line reflecting that it was for cabinets. The remaining checks were designated as "weekly draw" or "remodeling project." The Powells also submitted a check written to "Phillip Powell" for $7,000 with the notation that it was for the remainder of the down payment. (Ex. 3-6) There is no endorsement on the back of this check. Mr. Powell explained that this check was for the remainder of the down payment owed to Taylor. Taylor testified that he did eventually receive

the down payment in the agreed-upon amount but that it was not paid before he began work on the project. Excluding the check to Taylor of $1,000 for cabinets and including the check to Phillip Powell for $7,000 for remainder of the down payment, the Powells paid Taylor $74,000. Mr. Powell paid Taylor weekly. Taylor would accompany Mr. Powell to his bank each Friday. Powell's check to Taylor would be cashed, Taylor would keep 10% of the cash for himself and pay the remainder to his crew.

The Powells sold their previous home quickly and the renovations on the Hearne home could not be completed before they had to move, so they lived in a motor home on the property while the house was being renovated. This caused problems for Taylor's crew working on the job site, or, as Mrs. Powell described, "it made it worse for everybody" that the Powells lived on the job site during the renovations. Mr. Powell was on the job site much of the time, and was often belligerent towards workers, ranting and raving at them, cursing, using racial slurs, and directing Taylor's crews to other projects on the property. Mrs. Powell acknowledged that such behavior occurred but explained that it was "who [Mr. Powell] is", and that her husband was very frustrated and unhappy with the progress and quality of the work. She did not inspect the work herself but left that to her husband. Her focus was on keeping peace among her husband and the workers. The Powells believed that members of Taylor's crew were drinking on the job site because they found bottles in the attic. Taylor disputed this, stating that he and Mr. Powell forbade workers from drinking alcohol on the job, and that he never observed any of his workers drinking on the job site. He stated that many workers had been on the site over the years. He never saw bottles discarded as Mr. Powell contended.

Taylor employed six to eight general tradesmen to assist in the renovations. He had difficulty keeping workers on the job due to harassment from Mr. Powell. The painter quit due

to racial slurs from Mr. Powell. Mr. Powell asked workers to perform other work for him on the property, including breaking up remnants from granite slabs to use as a driveway. Due to the hostile working environment created by Mr. Powell, Taylor had to convince his workers to stay on the job. Taylor also alleged that Mr. Powell stole a folder from his truck containing documents noting changes the Powells requested. Mr. Powell denied that he took anything from Taylor's truck.

Mr. Powell set up an account at Lowe's, McCoy's Building Supply and other building supply businesses from which he purchased the materials to be used on the project. Taylor sometimes picked up materials from these businesses and transported the materials to the job site. Mr. Powell purchased lumber for the project that was not needed. He had Taylor return the materials to Lowe's for a refund, providing the original sales receipt to facilitate the return. Instead of getting a credit back on Powell's account, Taylor got a merchandise card that he gave to Powell. Taylor explained that when he attempted to return the items for a credit back to Mr. Powell, Lowe's was unsure which credit card account it should post the credit, so Taylor accepted the refund on a merchandise card which he promptly gave to Mr. Powell. This incident prompted Mr. Powell to question Taylor's trustworthiness, although he acknowledged that Taylor gave him the merchandise card and he never discovered any instances where Taylor returned materials and kept the refund for himself. Mr. Powell asked Taylor to return materials just once and only asked Taylor to purchase materials once. The Powells purchased all other materials, ceiling fans, and light fixtures for the project. Mr. Powell presented receipts and some return invoices from Lowe's, McCoy's Building Supply, Callaway Lumber, and a door and window company for items purchased for the remodeling project.

In addition to Mr. Powell's behavior, Taylor encountered other problems with the project itself. Portions of the home were sitting directly on the ground, and it had water and termite damage. The front walls were not built properly, and he estimated that repairs would be an additional $14,000 in labor and materials. These repairs would add an additional week and a half to the timeline. The living room floors were removed and had to be leveled and replaced. The leveling work was excluded from their contract but it needed to be completed in order for Taylor to complete other work. Powell arranged for Roy Henry to perform the leveling work. Much of the materials from the other house that the Powells hoped to incorporate in the remodeled home were not salvageable, causing the Powells to purchase more materials for the project than they had planned. That house had suffered from years of water damage caused by a large hole in the roof. The wood flooring from that house was so warped that it took Taylor's crew twice as long to remove than expected. Taylor's crew also spent four days running shiplap from that house through a planing machine before it was acceptable to the Powells and able to be installed in the renovated home. The Powells made changes to the original project including the completion of a wrap-around porch which required extending the roof, reframing exterior walls and rebuilding other walls. The porch extension required a new electrical panel to be moved and an air conditioning unit to be moved. These were items not included in the original contract.

Taylor told the Powells that the contract additions would require additional time and money. To straighten the front walls would cost approximately $14,000 and would require an additional week and a half to complete. To extend the porch would cost $10,000 and additional time. Powell testified that Taylor told him the additional work would cost $21,000. The difference, according to Taylor, was that the Powells gave Taylor a boat valued at $3,000 which Taylor credited against the charges. After nine weeks on the job, Mr. Powell told Taylor that he

would no longer pay him for the renovations. At that time, the Powells had not paid him for some of the additional items they requested. Taylor had extended the porch as requested but did not charge the Powells for the additional labor as a concession in order to complete the project. However, once he was informed that he would no longer be paid, Taylor decided he could not stay on the job. He left the project the end of October before all the work was completed.

At the time Taylor left, he estimated that 80% of the project had been completed. He believed the remaining work could be completed in three weeks at a cost of $18,000. When Taylor left, all roof work had been completed. The roof was steel and was placed over the existing roof while maintaining an air gap and extended over the new wrap-around porch. Although Taylor did not contract to perform electrical work, he believed that all that work was completed when he left the job. The Powells did not want any vents cut into the steel roof, so the plumber installed a ventless system. The porch had been framed and decked but the Powells had not decided if handrails would be installed. Wood used was rough hewn cedar which required no sealing and was not meant to be painted. Kitchen cabinets had been installed but not the countertops. Closets needed to be sheetrocked. Most of the floors had been installed. All but one window had been installed but the windows needed to be trimmed out. Taylor believed that he and his crew performed in a workmanlike manner, that all work was proper and of good quality, and that no work needed to be corrected or redone.

After Taylor and his crew left, the Powells hired other workers to complete the renovations. They paid individual workers in cash. Mr. Powell also completed some of the work himself. The Powells' bank had records of the cash withdrawals used to pay workers to complete the project but they did not bring those records to court. Mr. Powell had to return to

work to pay for the costs of the renovation. Mr. Powell estimated that only 20% of the job had been completed when Taylor left the project.

At some point in time after Taylor left the project, the Powells began to investigate him and his wife. The Proposal form signed by Mr. Powell included a pre-printed name and address: "Taylor Family Construction L.L.C., 1699 Piney Woods Lane, Hearne, TX 77859." They believed that Taylor provided them with a non-existent and therefore fraudulent business address in Texas. Taylor explained that the address printed on his Proposal form was a valid address for a storage building he used as his business address. Taylor's wife lived in a house on the lot that also included the storage building; the house and the storage building had separate addresses. The Powells also discovered that Taylor's Oklahoma LLC was not in good standing at the time they contracted with him. Taylor said he did not know that the LLC was inactive but learned that information after he worked for the Powells.

The Powells were not satisfied with the work Taylor and his crew performed. They submitted undated photographs, taken by Mr. Powell, which they believed reflected shoddy or improper workmanship. Mr. Powell said that photos were taken after Taylor left the project. These photos were of framing in the attic that appeared to be old or rotted wood without sufficient nails or support, a toilet vent that released into the attic instead outside through the roof, cedar posts on the porch not securely fastened, gaps between the roof and walls, and siding with vapor barrier, pink or purple framing studs which Mr. Powell purchased but believed were not used on the project. The Powells did not have another contractor review the work performed by Taylor to inform them regarding the quality of the work or whether work needed to be redone. Mr. Powell estimated that Taylor cost him approximately $100,000 to repair and complete the renovations. He also stated that they spent $135,000 on labor and materials for the work that

was to be performed by Taylor under their contract, $100,000 of which was labor costs. He estimated that he had to spend $62,000 to complete the work Taylor was to perform. The original Complaint filed by the Powells estimated that they paid $23,000 in additional labor costs and $15,000 in materials for a total of $38,000 to finish the renovations. Mr. Powell stated this amount was not correct. He had receipts for all the materials he purchased for the project but he neglected to bring all of them to trial. He did submit many receipts from Lowe's, Home Depot, Callaway Lumber, and McCoy's Building Supply dating from August 2016 through March 2017 for materials, windows, tile, siding, and fixtures. Some receipts were illegible; some included charges such as bottled water that appeared unrelated to the construction work. The Powells also submitted an invoice from Anchor Foundation Repair for $1,500, dated July 2017, which referenced concrete work for porch beams and flooring. When questioned regarding examples of how Taylor defrauded them, Mr. Powell could not identify any incident in which Taylor kept materials for himself that had been purchased by the Powells to use on their project or returned materials and did not turnover the refund to the Powells. In fact, Mr. Powell testified that he bought all the materials and the only time he recalled Taylor returning materials, Taylor provided him with the merchandise credit. Mr. Powell believed that he purchased lumber for the project that Taylor did not use in the project except around the windows. Windows were custom-made and should have fit when installed.

  At trial, Taylor reviewed each photo submitted and offered explanations of the work displayed. Some he could not identify. He stated that Mr. Powell was on the job site every day and he observed Powell taking photos of the work while Taylor was on the project. Many photos admitted as evidence were of the old home in its pre-renovation stage. He stated that many of the photos were of old lumber and framing in the original construction, not from work he or his

crew performed. The new lumber purchased by Powell was used in the renovation but not all could be seen in the pictures or without removing walls. Windows were properly measured and meant to be fitted into a rough opening then trimmed out. He denied using any of the materials purchased by the Powells for himself on other projects. The Powells did not want holes in the steel roof so the plumber used a different venting system. This explained the photo of the toilet venting into the attic. The photos of light shining between a wall and the roof line were of the steel roof installed over the existing roof with a required air gap. Another photo was of a ridge vent across the roof, properly constructed. He denied leaving anything open in the roof. Taylor was unable to correct the sway of the porch. He also used an unlicensed plumber to work on the house. Taylor stated that he did not discover this until the Powells sued him in state court. He regretted leaving the job unfinished. The workers the Powells hired to finish the job were relatives of Taylor's wife. Taylor believed they were paid $8,000 to finish the renovations.

### **III.** **Conclusions of Law**

Exceptions to discharge are to be narrowly construed with doubt being resolved in the debtor's favor. *Affordable Bail Bonds, Inc. v. Sandoval (In re Sandoval),* 541 F.3d 997, 1001 (10th Cir. 2008). Debts arising from breach of contract are dischargeable. It is only those debts which arise from a debtor's unacceptable misconduct, such as dishonesty, fraud, or intentional injury that are excepted from discharge under § 523. Creditors seeking to prevent discharge as to their claims have the burden of proving each element of their claim by a preponderance of the evidence. The Pretrial Order, approved and signed by both parties, cites 11 U.S.C. §§ 523(a)(2) and (6) as authority to except Taylor's debt to the Powells from discharge. Therefore, these are the causes of action analyzed by the court, and the Powells have the burden of proving each element. *Pino v. Jensen (In re Jensen),* 2019 WL 2403105, at *4 (10th Cir. BAP June 7, 2019).

The evidence the Powells rely upon is the poor quality of the work performed, including failure to complete the project on time and use of an unlicensed plumber to perform plumbing work, false information in the Proposal regarding Taylor's status as an LLC and his business address, and failure to provide refunds when Taylor returned materials purchased by the Powells.

### A. 11 U.S.C. § 523(a)(2): False Statements and Fraud

To except Taylor's debt from discharge under § 523(a)(2), the Powells must prove that Taylor obtained money, property, services or extension of credit based on (A) false pretenses, false representation or actual fraud other than a statement regarding debtor's financial condition or (B) a written statement that is materially false regarding debtor's financial condition upon which the Powells reasonably relied. Section 523(a)(2)(A) encompasses fraudulent or false representations as well as other forms of actual fraud that can be effected without a false representation. *Husky Int'l Elects. Inc. v. Ritz,* 136 S.Ct. 1581, 1586 (2016). The court construes the Powells' § 523(a)(2)(A) claim as relying on both false representations and actual fraud. To succeed under § 523(a)(2)(B), a creditor must show that debtor presented a materially false written statement regarding debtor's financial condition upon which it reasonably relied.

#### 1. 11 U.S.C. § 523(a)(2)(A): False Representations

False pretenses or representations are representations knowingly and fraudulently made that give rise to the debt. *Cobb v. Lewis (In re Lewis),* 271 B.R. 877, 885 (10th Cir. BAP 2002). The elements of a § 523(a)(2)(A) claim based on false representations are: 1) the debtor made a false representation; 2) the debtor made the representation with the intent to deceive the creditor; 3) the creditor relied on the debtor's representation; 4) the creditor's reliance was justifiable; and 5) the creditor was damaged as a proximate result. *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1873 (10th Cir. 1996) (citations omitted).

The Powells claim that Taylor misrepresented his corporate status and his address on the Proposal form he used to draft their agreement. They argue that this is evidence of false representations with the intent to deceive them. The Proposal form lists Taylor's business as an LLC. Taylor admitted that at the time he first met the Powells, there was no LLC in Texas and his Oklahoma LLC was defunct. However, he testified that he disclosed to the Powells that he did not have a Texas LLC prior to them hiring him and that they chose to hire him in spite of that fact. The checks Mr. Powell issued were made payable to Jeremy Taylor, not to Taylor Family Construction LLC. This supports Taylor's assertion that he disclosed that the LLC was not registered in Texas. Further, Taylor testified that his Oklahoma LLC was not in good standing at the time he presented the Proposal to the Powells, but that he was unaware of that issue. The court finds that there was no intent to deceive the Powells by Taylor. There was no explanation offered by the Powells regarding the importance of Taylor's corporate status to them and that they actually relied upon it in deciding to hire him. In fact, Mr. Powell stated that he chose Taylor because he was recommended by a friend and was unable to find anyone else available to do the work at the time. If the corporate status was important to them, it seems logical that the Powells would not have hired him or at the least would have waited for him to obtain a Texas LLC and issued checks payable to the LLC, rather than the individual. The court concludes that the representation on the Proposal form that Taylor operated as an LLC is insufficient to except a debt to the Powells from discharge. Although on its face it was false, the LLC representation was not made with an intent to deceive since Taylor disclosed that he did not have an LLC in Texas. The Powells did not rely on the representation, but even if they did, their reliance was not justifiable since Taylor disclosed that he had no Texas LLC.

Taylor also gave a credible explanation regarding the address for his company printed on the Proposal form. The Powells suggested that the address did not exist because the house on that property had a different address. They believed that a false address indicated Taylor did not have a legitimate company. Taylor explained that the address was not false and gave a credible explanation that the address was assigned to another building on the property the Powells believed to be the correct address. The court finds no intent to deceive the Powells by including this address on the form. As with the corporate status, the Powells did not rely upon the address to their detriment in hiring Taylor. They hired him because of a friend's reference and his availability.

The Powells allege that the plumbing work was to be performed by a licensed plumber. They did not allege that any of the plumbing work was improper or that they suffered any damages as a result of faulty plumbing. The court finds Taylor's testimony that he was unaware the plumber was not licensed to be credible. Although Taylor should have verified the plumber's credentials, this was not a requirement stated in the Proposal. Therefore, the court finds that there was no intent to deceive the Powells regarding the plumber and they suffered no damage as a result.

### 2. 11 U.S.C. § 523(a)(2)(A): Actual Fraud

Actual fraud requires proof of fraudulent intent, a fraudulent scheme, and injury caused by the scheme. *Cherry v. Neuschafer (In re Neuschafer),* 2014 WL 2611258, at *5 (10th Cir. BAP June 12, 2014.) The Powells' assert that the lapse of Taylor's LLC and address is proof that he defrauded them. By presenting the invoice with "LLC" they believe that Taylor held himself out to be a reputable, stable, experienced, company when in fact his LLC had been dissolved by the time they contracted with him to renovate their home. They allege this to be

Case 17-08019    Doc 140    Filed 02/07/20    Entered 02/07/20 09:48:00    Desc Main
Document      Page 14 of 20

actual fraud. Perhaps this could be proof of fraud and part of a scheme to induce the Powells to hire him. However, as the court has previously stated, the Powells sought out Taylor, Taylor disclosed to them that he did not have an LLC registered in Texas, and the Powells made all checks to "Jeremy Taylor", not to Taylor Family Construction LLC. This supports Taylor's testimony that he disclosed the facts surrounding his corporate status to the Powells before they hired him and they hired him anyway. The court finds no fraudulent intent or scheme regarding Taylor's LLC.

Further, the injuries suffered by the Powells are due to a breach of contract and disagreement regarding the quality of work performed by Taylor, not by a fraudulent scheme. There was no evidence that Taylor acted with the mental state required to prove fraud at common law, moral turpitude or intentional wrongdoing. *See Husky Int'l Elecs., Inc. v. Ritz,* 136 S.Ct. at 1586. Taylor did not obtain large sums of money upfront, he did not abscond with funds or materials, fail to pay workers, or leave with liens on the Powells' property. He actually began work on the job before the Powells paid him the agreed-upon down payment in full, he performed work without pay, and he did most of the work he contracted to do. He left the job before completion because the Powells would no longer pay him. The contract price, without the additional work the Powells requested, was $80,00 to $85,000. With the two additions of the porch extension and reframing exterior walls this amount increased to approximately $100,000. According to the evidence submitted by the Powells, they paid Taylor $71,000 before telling him they would pay no more. This amount was approximately 80% of the total contract price. This matches Taylor's estimate that the project was 80% complete when he left the job. He acknowledged that he could not finish the job in the time frame promised, but this was because

the Powells added items to the project and the house required additional work due to its poor condition.

The Powells' alleged that Taylor did not use all the materials they purchased for the project and believed that he stole some materials. They offered no evidence confirming their suspicions. They did not provide the court with estimates of what materials should have cost for this project with a comparison of what they actually spent. Both parties testified that Mr. Powell purchased the materials and Taylor had the right to pick up materials for the job. Taylor testified that all materials were left on the job site and used for the renovation; framing lumber was incorporated into the project but was not visible without opening walls. His testimony was credible to this court. The Powells lived on the job site and they were able to observe all the activities and work of Taylor and his crew. Mr. Powell admitted that Taylor promptly gave him the merchandise card from Lowe's for materials Taylor returned, and he admitted that he knew of no instance in which Taylor pocketed refunds for materials that should have been paid to the Powells. The court finds that no evidence was produced supporting the Powells' allegation that Taylor defrauded them of building materials.

The Powells' offered several estimates of what they paid to complete the project, ranging from $23,000 in labor costs to $62,000. But the Powells offered no receipts or bank records to confirm their estimates, nor did they provide any evidence that Taylor's work was substandard. The Powells did not pay what they promised to pay Taylor under the contract. The Powells offered no evidence to support their belief that Taylor schemed to induce them to hire him with an intent to defraud them. Mr. Powell admitted that they chose Taylor based upon a reference and because he could not find others available to do the work at that time. When pressed to tell the court how he believed Taylor committed fraud, Mr. Powell testified that Taylor didn't do

what he was supposed to, that he paid for lumber that Taylor was supposed to use in the project but that he could only see installed around the windows, and that Taylor caused him a lot of irritation. Even if the court were to assume that Taylor's work was negligent or lacking in quality as the Powells' contend, the court finds no evidence of an intent to defraud. Instead, the evidence supports Taylor's testimony that work was performed as promised. The Powells have not met their burden under § 523(a)(2)(A) to demonstrate actual fraud.

### 3. 11 U.S.C. § 523(a)(2)(B): False Written Statement Regarding Finances

To succeed under § 523(a)(2)(B), a creditor must show that a debtor presented a materially false written statement regarding debtor's financial condition upon which it reasonably relied. The Powells offered no evidence that Taylor presented any written information to them regarding his financial condition other than the invoice form with his company name and address. The Powells admitted that they did not seek information regarding Taylor's financial condition before they hired him. As the court has previously discussed, the information on the Proposal form regarding Taylor's corporate status and address was not material and the court finds that the Powells did not rely upon it in hiring him. Accordingly, the Powells have not met their burden.

### B. 11 U.S.C. § 523(a)(6): Willful and Malicious Injury

To succeed in excepting debt from discharge under § 523(a)(6), the Powells must prove that Taylor willfully and maliciously injured their property, i.e., that he deliberately and intentionally injured their property, not merely a deliberate or intentional *act* that led to injury. "An intentional breach of contract, without more, is insufficient to sustain a non-dischargeable claim under [] § 523(a)(6)." *May v. Cagan (In re Cagan),* 2010 WL 3853316, at *3 (Bankr. D. N.M. Sept. 28, 2010). The debtor must desire the consequences of his act or believe that the

injurious consequences are substantially certain to result from the conduct and that the conduct is without just cause or excuse. *Kawaauhau v. Geiger,* 523 U.S. 57, 61 (1998) "The Tenth Circuit applies a subjective standard in determining whether a debtor desired to cause injury or believed the injury was substantially certain to occur." *Pino v. Jensen (In re Jensen),* 2019 WL 2403105, at *11 (10th Cir. BAP June 7, 2019)(citations omitted).

      Most of the Powells' evidence consisted of photographs of the work site and their representation that the photos reflected shoddy construction. None of the photos presented included a date stamp. Mr. Powell stated that he took the photos from November 2016 through February 2017 but he was vague and unable to state precisely when he took the photos. Taylor reviewed each photo presented and explained what he believed was the subject of the photo. Some, he was unable to identify. He witnessed Mr. Powell taking photos when Taylor was on the job. Thus, it is likely that many of the photos submitted were taken during construction, before Taylor left the job. According to Taylor, many photos were of old construction that was not altered by the renovations. The Powells offered no expert evaluations of Taylor's work, nor did they contradict his explanations. Taylor offered detailed explanations of the work he performed and the subject of the photos. His explanations reflected his years of experience in the construction business. As both parties noted, the Powells were renovating a 112-year-old home that was in poor condition when they bought it. The materials they wished to include were from another old home in very poor condition. Thus, given his expertise and the condition of the property, the court finds Taylor's descriptions and explanations regarding the worksite and the items in the photos to be credible.

      The Powells made changes to the project along the way and were extremely hostile and difficult to work for. Mrs. Powell admitted that her role was to keep peace at the job site. She

stated that Mr. Powell's behavior of yelling and cursing was just who he was. Taylor testified that he intended to finish the project as he promised and continued to work despite the hostile work environment. The court finds that Taylor had a good faith intention to finish the work as quickly as possible and for the price they agreed upon. For the Powells to succeed in their claim under § 523(a)(6), they must prove by a preponderance of the evidence that Taylor intended to harm them, and that he intended to cause injury to the construction and renovations to the house. The court finds that Taylor performed most of the work he contracted to perform. He did not delay completion to cause injury but because the Powells added items to the project and the house was in worse condition than he believed. He failed to complete the project because the Powells refused to pay the agreed-upon price. Taylor evinced no desire to harm the Powells.

The evidence presented may establish a breach of contract by Taylor for failing to complete the work, but he provided ample reasons why he could not finish the job. Both parties failed to complete their duties under the contract. A breach of contract, even if intentional, does not establish a claim under § 523(a)(6). Even if Taylor's conduct proved reckless or negligent, the Powells would not meet the standard required to except his debt from discharge under § 523(a)(6). The evidence does not support a finding that Taylor acted willfully and maliciously to injure the Powells. Therefore, the Powells have not satisfied the requirements of § 523(a)(6).

## IV. Conclusion

This case is based primarily on evidence regarding breach of contract, and lacked evidence of fraud, false representations, and willful and malicious conduct. Taylor offered credible testimony and evidence that he provided the services he promised to perform for as long as he could. For the above stated reasons, the court finds that the Powells have not sustained their burden of proving an exception to discharge for any debt owed to them by Taylor pursuant

to 11 U.S.C. § 523(a)(2) or (6). The court shall enter a separate judgment in favor of the Defendant.

###